CASE 36—PETITION EQUITY—JUNE 5.

5bu 253
110 225

# Rau & Rieke vs. Boyle & Boyle.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. Parties to written contracts, without allegations of fraud or mistake, are concluded by, and estopped from denying, the statements contained in the writings.

2. R. & R., the owners of a lot of tobacco which had been unlawfully seized by General Payne, at Paducah, during the late war, agreed to give B. one half thereof, after deducting from the proceeds thereof a sum then due thereon, if he would get it released from the military seizure. B., as a loyal private citizen, secured the release.

    *Held—First.* That this contract was not contrary to law, or against public policy.

    *Second.* That it was not champertous.

    *Third.* That, under the circumstances, the compensation was not so exorbitant and oppressive as to authorize the court to set it aside on that ground.

3. R. & R. agreed to contribute all the money needed in purchasing tobacco, &c., in Western Kentucky during the war, and B. & B.

Rau & Ricke vs. Boyle & Boyle.

agreed to secure permits, and to protect it in shipment to market, for one half of the profits. B. & B. did not stipulate in the contract that they would pay any part of the losses. The adventure involved a loss. B. &. B. are not liable for any portion of the loss.

4.  One co-plaintiff assigned and transferred, without recourse, all his interest in the cause of action to his co-plaintiff, who released him from costs, &c. Defendants having plead a counter claim against the plaintiffs, the assignee deposited a sum of money in court to pay costs, &c., and then took the deposition of his co-plaintiff, the assignor. The deposit in court being insufficient to cover the probable costs of the action and the counter-claim, the deposition of the plaintiff assignor is rejected, on the ground that he was interested because of the inadequacy of the deposit.

JOHN RODMAN and
LEWIS N. DEMBITZ,                    For Appellants,

CITED—

5 *Watts & Serg.*, 315; *Clippenger vs. Hepbaugh.*

7 *Watts*, 152; *Gulden vs. Hatzfield.*

7 *J. J. Marshall*, 640; *McGill's adm'r vs. Burnett.*

6 *Dana*, 366; *Wood vs. McCann.*

4 *Dall.*, 299; *Mabin, survivor, vs. Coulon.*

15 *Peters*, 40; *Housman vs. North Carolina.*

2 *H. Bla.*, 379; *Mitchell vs. Cockburn.*

1 *Park. on Ins.*, *p.* 8 (*N. P.*); *Sullivan vs. Greaves.*

2 *Bos. & Pul.*, 372; *Aubert vs. Mase.*

2 *Bibb*, ——; *Bowman vs. Freeman.*

4 *Bibb*, 441; *Craig vs. Miller.*

4 *Littell*, 10; *Halbert vs. Deering.*

1 *Dana*, 594; *Wickliffe vs. Clay.*

8 *Dana*, 1; *Mercum vs. Hereford.*

7 *B. Mon.*, 547; *White vs. Bush.*

*MS. Opn.*, 1857; *Hamilton vs. Riley.*

4 *Mon.*, 313; *Morton vs. Smith.*

4 *J. J. Mar.*, 332; *Offutt vs. Stout.*

2 *Wallace*, 45 ; *The Toole Company vs. Norris.*

1 *Bush*, 270 ; *Hutchin vs. Gibson.*

THOMAS E. BRAMLETTE and

PIRTLE & CARUTH,                                      For Appellees,

CITED—

14 *B. Mon.*, 321 ; *Allen's ex'rs vs. Shelby.*

18 *B. Mon.*, 128 ; *Todd vs. Luckett.*

2 *Wallace*, 70 ; *Brooks vs. Martin.*

2 *Bos. & Pul.*, 3 ; *Tenant vs. Elliot.*

1 *Bos. & Pul.*, 79 ; *Farmer vs. Russell.*

7 *Vesey*, 473 ; *Thomson vs. Thomson.*

17 *Howard*, 232 ; *McBlair vs. Gibbs.*

*Civil Code, subsec. 6, of sec. 670, secs. 30, 31, and Myers' notes.*

17 *B. Mon.*, 603 ; *Carpenter vs. Miles.*

3 *Dana*, 158 ; *Williams vs. Beard.*

11 *B Mon.*, 100 ; *Craddock vs. Thornton.*

16 *B. Mon.*, 182 ; *Nixon vs. Jack.*

3 *J. J. Mar.*, 106 ; *Miller vs. Field.*

5 *B. Mon.*, 57 ; *Clark vs. Robinson.*

1 *Met.*, 576 ; *Smith's adm'x vs. Northern Bank of Kentucky.*

2 *Met.*, 518; *Chenoweth vs. Fielding.*

1 *Duvall*, 311 ; *Spalding vs. Bull.*

1 *Duvall*, 207 ; *Price vs. Caperton.*

*Amendment of March 2, 1860, to sec. 670 of Civil Code.*

3 *Bosw.*, 560 ; *Cummings vs. Morris.*

2 *Met.*, 127 ; *Lytle vs. Lytle.*

2 *Crompton M. & R.*, 588 ; *Raymond vs. Fitch.*

1 *Peters*, 213 ; *Comegys vs. Vase.*

JUDGE PETERS DELIVERED THE OPINION OF THE COURT:

Appellants having purchased a quantity of tobacco in that part of Kentucky west of the Tennessee river,

then within the military command of General Payne, of Paducah fame, that officer seized and held their tobacco under pretense of military authority to do so. They, on the 11th of August, 1864, while their property was thus wrongfully withheld from them, made a written contract with John Boyle, by which he undertook to procure its release for the compensation therein expressed (the terms of said contract will hereafter be substantially stated); and at the same time they made a transfer of fifty-nine hogsheads of tobacco to said Boyle, to enable him to carry out his part of said contract, the terms of which will be, also, hereafter stated. A subsequent contract was made by John and J. T. Boyle with appellants, for the purchase of tobacco and cotton on speculation, which was in writing, and will be again referred to.

On the 26th of January, 1866, John Boyle and J. T. Boyle brought this action in equity against appellants, Rau & Rieke, the said John Boyle joining in the action as plaintiff, for the use of said J. T. Boyle, on said two contracts, which are made parts of their petition, marked "A" and "D," respectively, and allege in substance that said Rieke represented that they had fifty-nine hogsheads of tobacco, purchased west of the Tennessee river, all of which was paid for; that other tobacco had been purchased, on which there was *represented* to be five thousand dollars of the purchase money unpaid and due, in which said John Boyle was to be interested to the same extent that he was interested in the fifty-nine hogsheads, to-wit: one half; that neither that sum, nor any part of it, was owing on said tobacco, nor was any amount paid by said Rieke; but that Rieke had executed and delivered to said John Boyle a transfer of the fifty-nine hogsheads, in which

he asserted that they had all been paid for by him, intending by said transfer to give to said John Boyle the entire control and possession of the tobacco. It is further alleged, that said Boyle did, from the date of the first contract, devote his time and energies to procure the release of said tobacco, and finally succeeded; whereby he became entitled to the one half thereof, or of its proceeds; that the same were sold by Shotwell & Co. in New York, and averaged per hogshead one hundred and fifty-two dollars and sixteen cents, aggregating the sum of eight thousand nine hundred and seventy-seven dollars and forty-four cents, the whole of which appellants had received and would not account to John Boyle, nor to J. T. Boyle, to whom it is alleged John Boyle had assigned his part, for any part of said funds.

The assignment by John Boyle of the part claimed by him of the proceeds to J. T. Boyle, is in writing, and is filed as a part of the petition.

It is also alleged, that, in addition to the one half of the proceeds of the fifty-nine hogsheads, appellants are indebted to them in the sum of $1,387 85, which grew out of the second agreement in writing, between the parties before referred to, to the following effect: That Rau & Rieke, being acquainted with the business, should buy cotton and tobacco, and ship the same under a permit then held by said John Boyle, from Major General Burbridge, or other permits which he might thereafter obtain; and the profits realized from said purchases and shipments were to be divided equally between the parties.

Under said agreement, appellees allege only twenty-two hogsheads of tobacco and three bales of cotton were purchased; but that appellants, pretending that they needed money to make the purchases contemplated by

said contract, induced J. T. Boyle to accept and indorse two bills, one for six thousand dollars and one for ten thousand dollars, on which S. B. Shotwell & Co. advanced the money to appellants; and, having thus obtained it, they fraudulently appropriated it to their own use, and failed to take up said bills when they matured, with the fraudulent intention of forcing Shotwell & Co. to apply the proceeds of all the tobacco and the three bales of cotton, which had been consigned to them, to the payment of said bills, although not as much as six thousand dollars was used in the purchase of tobacco and cotton under the last named contract.

They allege, finally, that the proceeds of the whole of the tobacco and cotton were insufficient to satify said bills by the sum of $2,775 70, the one half of which J. T. Boyle was compelled to pay, and which appellants are legally bound to refund to him; and that, added to the one half of the price realized for the fifty-nine hogsheads of tobacco aforesaid, makes the aggregate of $5,876 57, for which appellees pray judgment, together with all proper and equitable relief. And the chancellor, having rendered judgment in their favor for that sum, with interest from the day on which the action was instituted, and costs less the half of the $204 87, pleaded as a counterclaim in the answer, Rau & Rieke have appealed.

In their answer appellants aver that five thousand dollars were due on the purchases of tobacco, which they paid after the date of the contract, and for which payment they insist they have, by the terms of said contract, a right to a credit. They deny that there were as many as fifty-nine hogsheads of tobacco embraced by the transfer to John Boyle, but fail to state the quantity. They deny that they appropriated to their own use the greater portion, or any part, of the sixteen thousand dollars pro-

cured from Shotwell & Co. on said bills; but fail to show how said funds, or any part thereof, were used. They do not produce any account, and fail to make a statement of the manner or purposes to which said funds were appropriated; but aver that John Boyle had no interest in any other tobacco than that mentioned in the writing, which states that five thousand dollars of the price were unpaid, and, by the terms of their contract, were to be paid out of the proceeds, and of the residue said John Boyle was to have one half. That only nine hogsheads had then been delivered, and which were seized by General Payne; the balance of the tobacco purchased had not been delivered by the planters, in consequence of the order for its seizure by General Payne. They deny that John Boyle procured the liberation of said nine hogsheads, or any of the tobacco whatever; but aver that General Payne, while he was in command, refused to release the tobacco, and after he was removed, and General Meredith was put in command, appellant Rieke obtained the release from him. They deny that all the money procured on the acceptances was intended to be used in making purchases under the last contract; and say if it had been so used, the losses would have been much greater than they were, the one half of which they insist appellees should bear. They deny that they made any fraudulent pretense of needing the money, or took it with any fraudulent intent or purpose. They aver that, instead of twenty-two hogsheads only having been purchased under the last contract, thirty-two were purchased, nine of which were sent to the Pickett tobacco warehouse, and one was sent by J. J. Mooney to St. Louis. That all the money raised on said acceptances was used—a part in paying for

the tobacco and cotton purchased under the last con-
tract, and a part for the tobacco which was embraced
in the first contract, and was insufficient to pay the
whole due therefor by seven hundred and fifty-six dol-
lars and eighteen cents, subject to a credit of five
hundred and fifty-one dollars and thirty-one cents, the
price of three hogsheads of tobacco at the Pickett
tobacco warehouse, for which they are chargeable,
leaving a balance of two hundred and four dollars
and eighty-seven cents; and the one half of this sum
they allege appellees owe them. They also aver that
the intention of the parties to the second contract,
identified as exhibit "D," was, that they were to be
equal partners, and were to share the profits and
losses equally; that they all so understood it, and
acted under it; and if that is not its true and proper
meaning, the same is against good morals and pub-
lic policy. They exhibit an account, marked "J. L.,"
showing a loss of nine thousand seven hundred and
sixty dollars and twenty cents, which they insist pre-
sents a true state of the affairs between the parties.
The one half of said sum they claim to be due them.

Finally, they plead in bar—1st. That the contracts
are champertous; 2d. That their agreements were
mere promises to pay appellees for their loyalty, and
for the exercise of their influence with officers of the
United States Government, and consequently illegal as
against public policy; and 3d. That appellees, availing
themselves of their position and presumed power as
officers of the United State army, and the necessities
imposed on appellants by the illegal seizure of their
property, they extorted from them an unconscientious
contract, and one which is not legally binding on
them.

John Boyle, having relinquished all interest in the event of the action, testified on behalf of appellees, and the amount asserted as a counter-claim by appellants having been paid into court, John Boyle was admitted to testify for plaintiffs, although exceptions to his evidence on account of interest were filed, but were overruled, and exceptions then taken to the ruling of the court, and the correctness of which is questioned here, and will be hereafter considered. He proves that he procured the release of all the tobacco, and performed his part of the contract.

We will first consider the intent and effect of the writing executed by Rieke to John Boyle, purporting to transfer to him fifty-nine hogsheads of tobacco. As has been before noticed, appellants assert in their answer that there were not, in fact, as many as fifty-nine hogsheads seized by General Payne, nor *then* purchased by them; but that said number was arbitrarily assumed, and inserted in the writing, in order that the release, when obtained, might be broad enough certainly to embrace all the tobacco that might be claimed to be held by General Payne's order. That writing, according to its literal terms, transferred the absolute property in the fifty-nine hogsheads of tobacco to John Boyle; still he did not claim the whole; and in answer to the seventh cross-interrogatory, he says: "The paper transferring the amount was drawn up to enable me to control the tobacco, so as to obtain its release, and the paper of the same date showed the manner of division between us;" showing very clearly that the rights of the parties on a final adjustment, as between themselves, were not to be settled by the terms of that paper; but that it was made to present to General Payne as evidence that the tobacco had been sold to Boyle, whose sym-

pathies and feelings were in harmony with Payne's, and who would thereby be induced to release it. And Holt says in his deposition that he purchased the tobacco for Rieke, but that neither he, nor any one else, then knew how many hogsheads there would be, as it had not been prized. But for appellees it is contended that appellants are estopped, by their own solemn act in writing, to deny that fifty-nine hogsheads were seized by Payne. There is no evidence that there was not as much as the writing states there was; it is not in conflict with the statement as to the quantity in the cotemporaneous writing, filed as exhibit "A;" and the extent. of Holt's evidence is, that it was not known at the time how much there would be. Admitting all he says to be true, and still there may have been as much as fifty-nine hogsheads. But as to that fact we concur with appellees' counsel, that appellants are estopped by their writing to deny the quantity.

The next question to be considered and determined is, whether, at the time the contract evidenced by exhibit "A" was made, five thousand dollars, or any other sum, was owing for the tobacco? and if anything was due for it, how, or out of what fund, should it be paid?

In their petition appellees allege that when the contract was made Rieke represented that there were fifty-nine hogsheads west of the Tennessee river purchased and paid for, and also represented that other tobacco had been purchased, on which five thousand dollars were represented to be due, and in which said Boyle was to be interested to the extent of one half, as in the fifty-nine hogsheads; that neither the five thousand dollars, nor any part thereof, was due on said tobacco, "nor was the same so paid by said Rieke."

This allegation is in conflict with the facts stated in the written contract signed by Rieke and John Boyle, which has been heretofore referred to, and is to the following effect: that Rieke employed Boyle to get *his tobacco, bought west of the Tennessee* river, released from seizure by the military authorities, and sell the same on conference with said Rieke; and, as compensation, the said Rieke agrees to give him one half of *all* of said tobacco, or pay said Boyle one half, "*provided*, that a sum equal to the amount of the price yet unpaid, amounting to five thousand dollars ($5,000), or such part thereof as said Rieke may advance to complete the purchase, may be withdrawn from the proceeds of the tobacco purchased with the said sum of money, or any part thereof, and the remainder to be equally divided as stipulated above."

This writing includes all the tobacco bought west of the Tennessee river. If there was more than fifty-nine hogsheads, no distinction is made between it and the fifty-nine hogsheads; and, by its terms, five thousand dollars are declared to be owing for *the* tobacco, which sum is to be first paid out of the proceeds, and the residue thereof to be equally divided. No terms could have made the contract plainer. It is free from ambiguity, and cannot be misunderstood. There is no allegation in the petition that the contract, as made by the parties, was different from the one expressed by the writing. No allegation of fraud or mistake in reducing it to writing. Why, then, are not the five thousand dollars therein stipulated for, first to be taken from the proceeds of the fifty-nine hogsheads, before any division can be made or adjudged?

But it is contended, that as Rieke has said, in his transfer of the fifty-nine hogsheads to John Boyle, that

they were paid for by him, he cannot be allowed to con-
tradict that statement.   That transfer was simultaneous
with the other writing: was no part of the contract,
however, but was made to enable John Boyle, with more
ease and certainty, to execute his part of the contract.
By the terms of the transfer, he might have claimed the
whole fifty-nine hogsheads.   It states, on its face, it was
made to John Boyle for value received; and, in that
particular, is inconsistent with, and contradictory of, the
*contract of the same date between* the parties, which was
made to show what condition the article was in, about
which they were contracting, and the rights of each par-
ty in relation thereto.

The recital in the transfer, that Rieke had received
from John Boyle the value of the tobacco, was not
true.   Then, looking to this statement, and the object and
purposes of the parties in making and accepting said
transfer, it would be unreasonable to allow the mere
recitals thereof to neutralize and control a positive stip-
ulation in a paper deliberately made to evidence their
true and entire contract.

It is rendered reasonably certain, from the petition of
appellees, and exhibits filed as parts thereof, that fifty-
nine hogsheads constituted all the tobacco that Rieke had
purchased west of the Tennessee river, at the date of the
first contract.   . .

It is alleged that John Boyle did devote all his time
and energies to procure the release of the tobacco after
he became interested, and did actually procure the re-
lease of the fifty-nine hogsheads.   No more is claimed.
The terms were liberal; and, if more tobacco had been
actually purchased, he would have ascertained it, and
procured the release thereof also, as the part he was to
get was remunerative.   It is not alleged in the petition

that there was any more; but the allegation is, "*in addi_
tion to same*" (referring to the fifty-nine hogsheads), "*there
was represented* to be other tobacco, upon which five thou-
sand dollars was *represented to be due.*"    Who made these
representations the petition fails to allege; but it does
allege that twenty-two hogsheads were bought under the
second contract; and they, with the fifty-nine hogsheads,
were consigned to Shotwell & Co., of New York, whose
account of sales, filed as an exhibit in the cause, shows
that they received and sold eighty-one hogsheads.

But we have already seen that the writing, under
which appellees claim, states the fact, that, at its date,
five thousand dollars of the price of the tobacco were
owing, and appellees are concluded by it as to that
question.

It may be true that appellants sympathized with the
Confederacy in the late civil strife; still they are not
charged with any hostile act against the Government
of the United States, and could not rightfully be treated
as enemies to the Government in the war, but were en-
titled to the same protection and all the constitutional
rights of other citizens of Kentucky.    Their property
was in the State, its destination for sale within Federal
jurisdiction, "the articles not contraband," "nor the trade
illicit."    General Payne, therefore, as a Federal officer,
commanding the district, had no lawful authority to seize
their property and hold it, for the purpose of extorting
from them contribution, or impose on them a tax.    Such
acts were wrongful and tyrannical; and, if done when
and where laws could have been enforced, he might
have been made to account for them, both civilly and
criminally; but laws were then silent in that part of
Kentucky, and when they would again speak, or be
heard, appellants did not know.    But they were anx-

ious, doubtless, to procure the liberation of their tobacco; and as they could not then look to the law for redress—and, even if that remedy should again be restored, the delay might have been disastrous to their rights—under these circumstances, their only remedy seemed to be *the use* of moral means; and we cannot say that the employment of John Boyle to effectuate the purpose was either contrary to law or against public policy. Appellees had both resigned their positions in the Federal army before John Boyle undertook this agency, and it is not charged. that either of them advised or aided in having appellants' property seized or detained.

Nor was the transaction tainted with champerty; although appellees were lawyers, they were not employed for their legal learning or skill; other qualifications than these were requisite for success in this enterprise, which appellants thought they possessed, and hence they employed them to transact business much more diplomatic than legal in its character. But it is charged that the compensation exacted is exorbitant and oppressive. There seemed to be danger that the property would be lost to appellants; at least they might have reasonably apprehended such danger. In that emergency they must have deemed Boyle's services important to them. The price to be paid was contingent, depending upon success; time and labor were requisite, and expenses were to be incurred. Neither fraud nor imposition is made out; and we cannot say, under all the circumstances, that the compensation agreed to be paid was so oppressive as to authorize the court to set the contract aside on that ground.

But it is insisted that, on the purchases under the second contract, losses were sustained, and that appel-

Rau & Rieke vs. Boyle & Boyle.

lees should bear their portion of these losses. By the terms of that contract appellants were bound to contribute all the money needed in the adventure; that was their share of the capital; that of the Boyles was the permits which they had, or might thereafter procure through their influence, and the protection they would give to produce in which they were to deal. They were to advance no money, and did not stipulate to pay any part of the loss in case the adventure was unsuccessful. Appellants state they were acquainted with the trade, and only required the necessary permits to carry it on, which the Boyles were to furnish; consequently, if a loss was sustained, appellants must bear it.

The avowed object of appellants in getting the sixteen thousand dollars on the bills accepted by J. T. Boyle, on which Shotwell & Co. advanced the money, was to invest in cotton and tobacco under the second contract. They got it, and it was their duty to furnish to the Boyles a statement in full of the amount which was invested in cotton and tobacco, and if the whole was not so invested, to return the balance. Such account was easily kept and furnished, and we see no sufficient excuse, even in the answer, for the failure. We conclude, therefore, that they are justly chargeable with the one thousand three hundred and eighty-seven dollars and eighty-five cents, the one half of the unpaid balance of said bills after exhausting the proceeds of tobacco and cotton shipped to Shotwell & Co., with interest thereon from the 9th of May, 1865 (that being the time when the money was advanced), at the rate of six per cent. per annum till paid.

Whether John Boyle was a competent witness is the next question for determination. He is a co-plaintiff, and as such, his liability for costs cannot be questioned. His assignment of the claims to J. T. Boyle without recourse, and the release of the latter to him from all responsibility, could not release him from the liability to the defendants in the action which he had incurred by becoming plaintiff therein, nor was the deposit of the money into court a sum sufficient to meet the demand set up as a counter-claim and the probable costs. J. T. Boyle might have had his name stricken out as plaintiff, and made him defendant by motion to the court, and having the proper orders made as to security for costs. This was not done; and when his deposition was taken he was liable for costs.

In *Warner vs. Turner* (18 *B. M.*, 758) the actions were originally brought in the names of the Porters as plaintiffs. Subsequently Thomas Turner was, by an order of court, substituted as plaintiff in the actions, and the costs, future as well as passed, ordered to be charged to him. After this was done he took the depositions of the Porters. Warner excepted to their depositions, and the same were overruled. Warner then brought the case to this court, and the only point relied on for reversal was the decision of the court below admitting the depositions of the Porters.

In the opinion delivered, this court said: The effect of the order thus made was to release the Porters from liability for costs, and inasmuch as their assignment to Turner was without recourse, no perceivable objection then remained to their competency as witnesses. Can it be doubted, that if they had continued liable for costs, or that if their liability for costs, both past and

future, had not been entirely removed, that they would have been incompetent, and the exceptions to their depositions sustained? That conclusion is inevitable; and we think John Boyle was incompetent on the same principle. But the rejection of his evidence will not materially affect the result.

After denying that Boyle got the tobacco released, appellants, in their answer, admit, that when the "first contract was made six thousand seven hundred and seventy-nine dollars and sixty-three cents were paid on the tobacco then embraced by that contract," and say that "they are willing to stand by their agreement with John Boyle as far as it is an *executed contract*, and has been acted upon by the parties, and understood in their dealings afterwards." Now what was intended by that, unless it was executed by getting the release of the tobacco, and giving credit for the one half of said sum; but they insist on charging him with one half the losses on the tobacco, which they allege amounted to more than that sum? Indeed, upon their theory the precise loss on the tobacco could be ascertained as follows: They said at the date of the contract they had paid six thousand seven hundred and seventy-nine dollars and sixty-three cents, and owed on the tobacco five thousand dollars, making the whole cost eleven thousand seven hundred and seventy-nine dollars and sixty-three cents, and netted, when sold, the sum of eight thousand nine hundred and seventy-seven dollars and forty-four cents, making the loss two thousand eight hundred and two dollars and nineteen cents; but the Boyles, by the contract, are not bound for any part of that loss. The foregoing quotation from the answer is an admission in effect that John Boyle did procure the release of the

fifty-nine hogsheads, and that they are responsible, but attempt to escape it, and to settle his claim by charging him with what they aver is his part of the loss. This they cannot do.

The proper basis for the settlement is as follows:

Proceeds of fifty-nine hogsheads of tobacco -  $8,977 44
Deduct amount due for same - - - - - -    5,000 00

                                      2)$3,977 44

To the one half of this sum Boyles are enti-
    tled, viz: - - - - - - - - - - -   $1,988 72
To which add amount paid Shotwell on bills,    1,387 85

Making the sum of - - - - - - - -   $3,376 57
with interest from the 9th of May, 1865, till paid, and costs in the court below.

Wherefore, the judgment is *reversed*, and the cause is remanded, with directions to render judgment for the amount stated, and for further proceedings consistent herewith.